# EXHIBIT 2

# In The Matter Of:

*United States of America v.*
*Marian Morgan*

---

*John Morgan*
*January 6, 2012*
*Sworn Statement*

---

*Michael Musetta & Associates, Inc.*
*One Tampa City Center, Suite 3400*
*201 North Franklin Street*
*Tampa, Florida 33602*
*Phone: (813) 221-3171; Fax: (813) 225-1714*

Original File 010612Morgan.txt

**Min-U-Script® with Word Index**

**Sworn Statement**

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

vs. Case No. 8:09-cr-00585-T24-TBM

MARIAN I. MORGAN,

Defendant.
_ _ _ _ _ _ _ _ _ _ _ _ _ /

SWORN STATEMENT OF: JOHN MORGAN

DATE: January 6, 2012

TIME: 3:08 p.m. to 4:16 p.m.

PLACE: 14400 49th Street North Clearwater, Florida

PURSUANT TO: Notice by counsel for Defendant for purposes of discovery, use at trial or such other purposes as are permitted under the Federal Rules of Criminal Procedure

BEFORE: PAMELA KINGSBURY, RPR Notary Public, State of Florida at Large

Pages 1 to 55

APPEARANCES:

BARRY COHEN, ESQUIRE
Cohen, Foster & Romine, P.A.
201 East Kennedy Boulevard
Suite 1000
Tampa, Florida 33602
(813) 225-1655
Attorney for Defendant

INDEX PAGE

DIRECT EXAMINATION BY MR. COHEN 3
CERTIFICATE OF OATH 54
REPORTER'S CERTIFICATE 55

E X H I B I T S

(No exhibits marked.)

JOHN MORGAN,

the witness herein, being first duly sworn on oath, was examined and deposed as follows:

THE WITNESS: I do.

DIRECT EXAMINATION

BY MR. COHEN:

Q. John, let me start off by reintroducing myself to you. I first met you eight or ten months ago, I think. That's when you and Marian Morgan were talking to me about hiring me to represent you-all in this federal criminal matter that you were both facing at that time. We weren't able to work that out, but I remember that we had a discussion with you, Marian, and myself present. I'm not sure whether Todd Foster was present there or not. Do you remember?

A. He was there. It was right about the end of January, I think. It was you and Todd -- let's see.

Q. Was Everett Rice there?

A. I think I met Everett Rice and Todd Foster first. Then we had a meeting, the three of us, after that. Because they met me individually, Marian first; and then we got --

Q. Okay. And then combined, you and Marian were there, and Todd Everett and myself were there?

A. That's right.

Q. My recollection -- I haven't reviewed my notes

from that meeting. If I did, I probably couldn't read them, to be honest with you.

A. That's okay. Maybe you weren't taking any.

Q. My recollection is that you and Marian both told me and told Todd and Everett, if he was present, that you and Marian had not really committed any crimes. Marian told me that. You told me that as well. Do you remember that?

A. Uh-huh. (Indicates affirmatively).

Q. Is that a "yes"? You can't give those --

A. That's right.

Q. You can't give those "uh-uhs" and "uh-huhs."

A. Yes. That's right.

Q. She's good but just articulate a word.

A. Okay. Sure.

Q. Then we were not able to work out the representation. You had another lawyer. I forget. Who was your lawyer? Robert somebody?

A. Robert Tager.

Q. Tager. And Marian had another lawyer, Pete --

A. Peter Sartes.

Q. Sartes?

A. Correct.

Q. And then --

A. George Tragos.

Q. And George Tragos. And my understanding is that

you entered in a plea agreement with the government, and you've been sentenced to ten years; and then Marian, of course, went to trial and was since convicted and has not been sentenced yet.

A. Correct.

Q. And after her trial, her family contacted me -- her sister -- about representing her in the appeal.

A. Right.

Q. And we agreed to do that, and that's part of what this is about.

A. Okay.

Q. So my purpose of coming over today is to get as much detail from you about what happened. Marian has told me that you've written her and I think maybe even spoken to her and told her that, in effect -- I think the way she put it was that you had told her you were a pilot and a scuba diver and -- is that true?

A. That's right.

Q. Are you a scuba diver and a pilot?

A. Yes.

Q. I think she said you told her that you assess risk as a scuba diver and as a pilot.

A. That's right.

Q. And that you were doing the same thing in this case, basically.

A. That's what I felt. I felt, you know, gauge the risk. I don't ever want to go outside the boundaries of my skill, my knowledge, and what I feel comfortable with. I want to know what the result is going to be.

Q. As opposed to the uncertainty?

A. Yes. I told her I like to know what is fixed rather than dealing with a lot of variables.

Q. I understand.

A. Variables make me very nervous. It's like flying in the clouds without instruments.

Q. I understand. Now, Marian also tells me that you had told her that you've always believed and shared with her on many occasions that you-all had done a legitimate business and that this case that the government was bringing against you and her was not a case that had merit, that, in fact, both you and Marian had a legitimate business and acted without any criminal intent and had done the things that you-all thought were right as a going business.

A. That's correct.

Q. Is that correct?

A. Yes. We told people --

Q. Do you still believe that?

A. I still believe that. We told people we would pursue trade contracts with banks and traders, people that had expertise in that field; and that's what we did. We

pursued those contracts, and we achieved going into contracts in several cases.

Q. And you did that with a lawful intent?

A. Yes, we did.

Q. And you did that without any criminal purpose or purpose to cheat or steal or deceive somebody?

A. That's correct. Our goal has always been to pay people back not only the principal but also returns and interest on their money.

Q. So that was part of your business enterprise that you and Marian had?

A. Yes.

Q. And did people know that? Was that something that you discussed with them as to what your intention was when you entered into these kind of business deals with them?

A. Certainly.

Q. Okay. Now --

A. I explained to them the first conversation on the phone. Each one signed a request for information form in order to be put on the phone with me, and I described then the details of what it is we were going to be involved in. But the request for information form outlined that it was not a business that was regulated by the Securities and Exchange Act.

So you perhaps knew it was a nontraditional business. The intent of signing that form was that they were not being solicited, that they were requesting information from me.

Q. All right. Now -- and you've always told anybody who questioned you about this allegation that you never had any illegal purpose or unlawful purpose. You've told people that you were acting -- you and Marian both were acting in a legitimate way.

A. That's correct.

Q. Now, there came a time when, as I understand it -- and you correct me if I'm wrong because I'm not putting -- making an effort to put words in your mouth.

A. Sure.

Q. This is the way I understand it. You correct me if I'm wrong.

A. All right.

Q. There came a time when you figured that this minimizing-the-risk mindset that you have consistent with your experience as a pilot and as a scuba diver -- and I understand what you mean by that, although I'm neither because I don't like the risk that goes along with that.

A. That's right.

Q. But at any rate, there came a time when you decided that you wanted to at least test the waters and find

out what you could do to -- see what the government would do as far as giving you some kind of opportunity to minimize your risk.

A. That's right. In terms of managing my legal liabilities with this case, that's what I wanted to do.

Q. Now, did you find out that -- in making an effort to do that, did you find out that the authorities required you to say things that were inconsistent with the truth for you to be able to get a somewhat risk-free opportunity?

A. You know, I felt that at times what I was doing was conforming to a business model that was fitting the requirements of gaining a conviction without really looking at the factors that were really representing the other side of the story.

Q. You have to explain that to me. I really didn't understand. What I'm trying to ask you -- let me rephrase it, see if that will help you.

Based on what I'm hearing -- what I'm hearing from you is that there came a time when you, in an effort to minimize your risk in this case, had to basically go along and say things that the government wanted you to say in order for you to get the minimum risk, that you had to say things that you really didn't believe and were really not accurate.

A. Well, I had to make statements regarding

fraudulent intent that I did not feel represented my original intentions in our business.

Q. So saying things to the government -- you made statements that you had a fraudulent intent when you engaged in certain business transactions; but, in fact, you did not.

A. That's correct.

Q. Okay. Now, did you make those statements to the government because you had been promised certain benefits from the government if you made those kind of admissions?

A. Well, I'd not been promised specific benefits from the government.

Q. Well, they --

A. Not necessarily, no.

Q. They didn't make specific promises to you, but they made you feel comfortable that you were going to benefit in getting substantially less time if you told them what they wanted to hear.

A. Naturally. That's the assumption, that I'm going to get less time and also sign a plea which involves reduced charges.

Q. So was that an assumption, or was that statements that were said to you from which you could make that reasonable inference?

A. Yes.

Q. And can you tell me what some of those statements

**Sworn Statement**

were? Can you help me understand without me putting words in your mouth? Because I wasn't there. I'm hearing you say that you really had no fraudulent intent in the business that you and Marian were in; is that right?

A. That's right.

Q. And I'm also hearing you say that in order to minimize your risk, you had to say that you did have fraudulent intent to get the certainty in the sentencing that you wanted and that you were basically promised.

A. That's correct. Well, there are two things there that we're talking about. One was statements that I made to people regarding our business activities and the use of their funds. We told them we were pursuing trade contracts. We told them -- they also signed a document that was sent to our lawyer in Denmark that gave our company, Morgan European Holdings, unlimited discretion over the use of funds for our business.

So to say that we entered into a relationship with them with the intent to obtain funds through misleading statements, to me, is not an accurate statement. They gave us authority. Each one of them signed a document to that effect.

Q. And that's why you're saying that when you entered into these business transactions with these people, you did so lawfully and with an understanding that you were

acting with lawful purpose.

A. Yes. That's correct.

Q. I understand that. But now in order for you to get what the government had promised you or suggested to you, as I hear what you're saying, you had to go along with saying that you were doing things with wrongful intent, fraudulent intent; and you went along with those things because you figured it would be in your best interest, right?

A. That basically I'm in a position of making an explicit agreement that my behavior was fraudulent, my intent was fraudulent.

Q. And you did that because you believed it to be in your best interest?

A. That's correct.

Q. Not because it was true?

A. That's right. It was in my best interest to do so.

Q. Your best interest being that the government authorities either suggested to you or said things to you from which you could infer, or words to that effect, that if you did that, that they would do what they could to help you out in the sentencing, maybe get a cap on sentencing, maybe inform the Court of your cooperation, those kind of things to help get you as minimum amount of time in jail as they

could, right?

A. Exactly. There's something more than an implied benefit.

Q. Sorry?

A. There's more than an implied benefit. There's an explicit benefit to a plea. Not only reduced charges, but because my cooperation is required and there's the threat of bringing the original charges back if my cooperation is not sufficient, then there's a certain amount of duress involved in taking the plea with the expectation that there's a benefit in doing that.

Q. And so you made the calculated decision that -- notwithstanding that it was not true, being that you didn't act unlawfully, you believed it to be in your best interest to go along with what they were suggesting to you, that you acted unlawfully and with criminal intent, so that you could be in a position to get their help at sentencing and not get your original charges reinstated.

A. That's correct.

Q. Okay. Now, you knew -- I'm asking you if you knew --

A. Sure. Okay.

Q. Did you know or did you believe that they wanted you to testify against Marian Morgan, your wife?

A. Well, I knew that they wanted me to testify as a

**Sworn Statement**

rebuttal witness originally. That was under the terms of my plea agreement. But then when it came time for the trial to begin, my lawyer sat me down -- Robert Tager -- and informed me that unless I was testifying as a direct witness, then my cooperation may not be considered substantial assistance.

Q. Unless you testified as what?

A. As a direct --

Q. On direct?

A. Right.

Q. In the direct case?

A. Right, and that basically the result would be, if I was only testifying on rebuttal, that I could likely receive the full 15 years that my plea outlined and that there wouldn't be any additional benefit in terms of reduction from that full sentence.

Q. Okay. And did he also suggest to you that the government would perceive that as not cooperating and they could reinstate your original charges?

A. No. Under that term, no, he didn't imply that. It was just under substantial assistance. It may not be enough assistance.

Q. So did you tell Mr. Tager during the process that you had not committed these crimes and that you never acted in these business transactions with criminal intent, the same thing that you told me when I spoke to you originally?

Did you tell him the same thing?

A. Honestly, Barry, I think every time I met with my lawyer, we got into heated discussion because of my insistence that we always acted properly and in the best interest of our clients and with full intent of not misrepresenting things and that we worked as hard as we could for four to five years on doing the work we told them we would do, going into these trade contracts, producing return for them, paying them back their principal and the interest and returns on their money that they were promised and being true to our word. Always, always got into heated discussions about that with him.

Q. So you would tell him that you and Marian were engaged in lawful activity during your business transactions with these investors.

A. That's right.

Q. And as I understand what you're saying, you would tell him that on many occasions.

A. Just about every time I met with him.

Q. And approximately how many times was that, John?

A. Probably eight or ten times over the period of a year and a half.

Q. When you told him that you were acting lawfully -- you and Marian both were acting lawfully and with lawful purpose in these business transactions, why

would he argue with you? Because you were the one who was doing the business, not him. What would he say to argue with you about that?

A. He basically disagreed with me in saying -- through our E-mail communications and the promises that were made of keeping funds in escrow with our lawyer and then having them transferred to accounts in the U.S. under our control, he was basically telling me that it was clear-cut that we were not acting in an honest manner, in a legal manner, and that what we were doing was unlawful.

Q. Did he ever go over anything specific with you and show you any document or E-mail that you could explain to him why you were saying that it was lawful?

A. Well, we went through some of our computer records, some of the E-mails. When he saw the contracts that we had with brokers and traders, he said that there was no way that that type of a contract would represent a legitimate business. He was demonstrating to me that I should have known or that I did know that those were trades that did not exist.

Q. So he thought that you should have known that they were unlawful?

A. That's correct.

Q. And you explained to him that you, in fact, didn't know?

**Sworn Statement**

A. That's right. I told him we believed fully that the people we're dealing with were legitimate people and that we were going into trade with them.

Q. So when --

A. Well, he also said that none of the funds we were representing with large, high net worth investors -- he said none of those funds were legitimate funds.

Q. That's what he told you?

A. He told me without documenting how he knew that.

Q. What did you say to him?

A. I told him, Well, we submitted them to our contacts for these trades, and we were being told that they were being taken -- we were going through compliance with the banks, and we were getting word back from them that we passed compliance. We discussed wiring those funds to these traders, these banks.

We were in the middle, in the middle of high net worth clients representing large blocks of assets and these traders, and we're doing what we need to do to put a transaction together, to have funds transferred. We're relying on the statements and assurance of these traders that we passed compliance, that the funds are legitimate, that they've been checked out, you know. We're not the account signatory on these assets, so we're relying on other people to tell us the truth.

**Sworn Statement**

Q. And he would argue with you about that?

A. He just stated to me that the trades weren't real, that the assets we were presenting weren't even real, and because of this, our use of our clients' funds represented a fraud, that it was illegal activity.

Q. Did you get the feeling he was always trying to get you to plead guilty of something that you weren't guilty of?

A. I wouldn't say I felt he was trying to get me to plead guilty, but I never got the impression from him that he was willing to take this case to trial and really fight my case, represent --

Q. Did you feel like he had investigated the case properly and interviewed witnesses that were available to be interviewed and discussed all the relevant documents with you that needed to be discussed?

A. Gosh, no, I didn't. In fact, I thought he -- I didn't think he talked to very many witnesses at all other than our lawyer in Denmark. I think that was the only person he had spoken to.

Q. Did he interview any witnesses, prospective witnesses?

A. None of our trade providers. I don't know if he spoke to any of our clients of Morgan European Holdings. I don't know how many of those he spoke to at all.

**Sworn Statement**

Q. Did he go over all the relevant documents with you before your plea?
A. I believe he did. I believe he went over -- "relevant documents" meaning --
Q. The documents --
A. From our business?
Q. The documents that you believe to be relevant from your business, yes.
A. In terms of our contract with our clients?
Q. Yeah.
A. You know, to a limited extent.
Q. To a limited extent?
A. Yeah. Because I would try to bring up whether or not our contracts were considered, you know, valid contracts in the United States or Denmark.
Q. But you continued to tell him that you had no criminal intent during any of those transactions?
A. That's right.
Q. That you and Marian were acting lawfully as far as you were concerned, as far as Marian was concerned?
A. That's right.
Q. And you told that repeatedly?
A. Repeatedly. I would go into detail with Robert about the extent of our travel, the meetings that we had, how we worked 24 hours a day to do compliance documents, to

**Sworn Statement**

get into trade, to produce results. I told him about how -- that's why we went to Hong Kong in July of 2009 that caused us to miss a hearing in our civil case, that the reason we were in Sri Lanka was to establish bank accounts for receiving payment on trade contracts. I went into a significant amount of detail.

Q. Okay. Now, I asked you earlier was it your impression that he was trying to get you to plead guilty and cooperate with the government.

A. I don't want to say that he was trying to influence me to plead guilty. I would prefer to say that he was allowing me to make an independent decision on that. He told me that he was willing to take our case to trial if that's what I wanted to do, but he did advise me that he felt a plea was a better option for me.

Q. Even though --

A. That was his advice.

Q. Even though you told him that you were not guilty and did nothing with any criminal or illegal intent, that was still his advice?

A. That's correct.

Q. Okay. And you determined at some point, I think, that it was better to calculate your risk and have some certainty, like a cap, as opposed to the uncertainty of an open plea or trial.

A. That's right. I told him I was uncomfortable with the variables of going to trial.

Q. Now, when you -- but in order to accomplish that, you had to say things to the government that was not true? You had to say that you had criminal intent and fraudulent intent when you engaged in these business transactions? That was the only way that you could accomplish your objective, right?

A. Well, let me put it this way: I had to agree to a plea agreement that I was not the author of. When it's presented to me with statements in there that basically outlined what the terms of my plea agreement are -- you know, like I said, I did not write that.

Q. Who wrote that? Diane the IRS agent?

A. You know, I don't know actually who wrote it, whether it was the prosecutor, Diane, or --

Q. But in that plea agreement, you know that there were a lot of statements in there regarding allegations about you and Marian that were not true.

A. A lot of statements stating that we never entered into any trade contract, we never met with any person who was a trader, when for five years we'd been going around the world to Europe and Asia meeting with people that we believed were brokers and traders representing legitimate investments for us.

Q. What else did they say that wasn't true?

A. Essentially that we knew from the very beginning that these types of trade programs -- trading in medium-term notes and with these banks -- that these programs did not exist, statements that they're not endorsed by the Federal Reserve and that -- by the "Federal Reserve," the World Bank, the IMF -- that these types of organizations make it publicly known and easily obtainable information that no such trade programs exist and that these are frauds and that we knew that information when we did not.

Q. And it's said that you knew that information and that you knew that Marian knew that information was not true.

A. That's right, that she knew it was not true.

Q. And you had told your lawyer Robert Tager that those statements in there were not true before you signed it during the course of your discussions, or the subject matter in there -- you had told him the truth about the subject matter.

A. Oh, yes.

Q. So he knew when you signed it that you were signing a document that you really didn't believe to be true because of what you had told him.

A. That's correct. I discussed many times with him about these trades, and I even produced paperwork --

Q. So you signed things in there that inculpated you and inculpated Marian Morgan, your wife, which you knew not to be true.

A. That's correct.

Q. And you did that so that you could achieve the best calculation of as minimum time as you could get in this process.

A. That's right. So that I could get the lowest sentence I could achieve by doing that.

Q. Now, did there come a time when -- where the government and your lawyer expected you to testify to what you signed in your plea agreement under oath and in the trial of Marian Morgan? Do you understand my question?

A. What was the question again about testifying?

Q. Did there come a time when the government and your lawyer expected you to testify in Marian Morgan's trial as to the contents that were in your plea agreement that you signed to be true?

A. The government asked me to testify that they were true statements.

Q. Yeah. And you knew they were not true?

A. That's correct.

Q. And did you tell the government that you would be willing to testify to what you said in the statement in order to basically accomplish the objective that we've been

speaking about?

A. That's correct.

Q. So the government --

A. To represent not only cooperation under the terms of my plea but to achieve substantial assistance.

Q. Okay. What is your understanding of "substantial assistance"?

A. Essentially that I'm providing testimony or evidence that contributes toward the conviction of another defendant.

Q. In this case, it was Marian Morgan, your wife?

A. That's right. It was my own wife. And I had a lot of problems with that, Barry. You know, I'm happily married for 13 years and honor my wife. I have a very loving relationship, and this was a very difficult experience.

Q. So what you were basically having to do is to -- was to get a benefit from your wife -- excuse me -- get a benefit from the government for saying something that was really not true that would inculpate your wife and be evidence against her at her criminal trial.

A. That's what I was being asked to do.

Q. Or being told to do --

A. Told to do.

Q. -- in order to get the benefit that you were

promised by the government?

A. That's right.

Q. And your lawyer knew all the time that that information in that plea agreement was not true because you had continuously told him that was not true; and nevertheless, he let you sign it to get the benefit of the bargain that you were being offered.

A. I told him many times, Barry --

Q. Was that a true statement, what I just said?

A. That's a true statement.

Q. And did you start to say you told him many times that the information in that plea agreement was not true, and you had told the truth on many occasions that he would argue with you about when you would meet with him in the jail?

A. That's correct.

Q. Now, did you decide after you signed that plea agreement and promised to testify on direct examination -- even though it was going to be false testimony against your wife, did you at sometime -- did you later decide that you were not going to do that, you were not going to testify against her; or did the government decide not to call you on direct examination?

A. The government decided they were not going to have me testify direct, but they did have me sign a

**Sworn Statement**

statement which represented to the Court what my testimony was and --

Q. What your testimony would be?

A. That's correct. But my lawyer also asked me to basically release my attorney/client privilege so that he could go to court and testify on my behalf.

Q. Why did he do that?

A. My impression was he was there to testify that my plea was not under duress, it was under my full cooperation and that I assisted in that plea and that it was honest and correct in its statements.

Q. Well, that was not true from what I'm hearing you say to me. I'm hearing you say to me that you testified -- that you were going to testify under oath in Marian's trial to information that you had signed in your plea agreement which was not true and that you had told Mr. Tager on many occasions that that was not true.

A. I told him many times it was not true.

Q. Notwithstanding that, he knew that you were doing that to be able to get the benefit of the bargain that the government had promised you.

A. That's correct.

Q. And he had discussed that with you, that if you didn't do what the government wanted you to do, that they were not going to give you substantial assistance and that

they may charge you with the original charges, and that was something that was not something that you wanted.

A. Well, if I made any misleading statements to the Court, then the original charges could be brought back.

Q. And in "misleading statements to the Court," you mean telling the Court the truth? Is that what he meant? If you told the Court the truth, then that wouldn't be acceptable?

A. Well, that would be -- yeah. That would be my interpretation of it.

Q. Because you'd have to say to the Court, as I understand what you are saying, what you had said in the plea agreement in order to get the benefit of your bargain.

A. Well, if I was to change my testimony, sure.

Q. And Mr. Tager knew that was not true because you had told him that.

A. That's right. Because I had told him that.

Q. And you never -- during all those discussions, you never told him that what was in the plea agreement was the truth. You insisted to him that -- he knew that you had told him many times that was not true.

A. That's right. And I told him that I'm not a fraudulent individual. We didn't enter into our business to commit a fraud.

Q. But he told you if you said that, you couldn't

get the benefit of your bargain, the substantial assistance; and the Court may not accept your plea.

A. Well, he told me if I was only required to testify as a rebuttal witness, that may not be substantial assistance enough for a reduction in my sentence.

Q. But you had told the government that you would testify against Marian as a rebuttal witness under oath in order to -- so that you could get basically what they promised you.

A. That's correct.

Q. But you don't want to do that.

A. That's correct.

Q. But to get what they promised you, you were going to agree to do it.

A. What I wanted was for Marian to be able to present her defense without my interference.

Q. Tell the truth without you having to say she was lying.

A. That's right.

Q. But you were willing to say that to get the benefit of your bargain --

A. That's right.

Q. -- if the government insisted on it.

A. They did.

Q. But instead, your lawyer came to you and said,

**Sworn Statement**

Rather than you testify, let me testify; is that right?

A. Well, I believe what happened in the trial -- I believe that after the statement that I had signed was presented in the court, I believe that Marian stated openly to the Court in front of the jury that that statement was signed under duress and that it was not true. And so I think having Robert testify on my behalf was to counter that statement that my plea was done --

Q. Well, why didn't they put you on to say that?

A. They know I love my wife, Barry.

Q. Well, do they also know that you had -- that Robert had -- you had told Robert that the stuff in that plea agreement was not true?

A. To tell you honestly, I feel that the prosecution felt that my version of outlining our businesses as a fraud was different than the version that the government wanted to present at trial and that my version was not going to be strong enough and that it might be damaging to their case to have me testifying.

Q. So it was too risky to the government to put you on.

A. Precisely.

Q. Is that when your lawyer made a deal with the government that he would get you to sign a waiver of attorney/client privilege and let him testify?

**Sworn Statement**

A. That's right.
Q. And he testified that --
A. Well, they asked me numerous times was I able to testify against my wife and according to the terms of my plea and so forth.
Q. Did you hesitate to do that because you knew it wasn't true?
A. That's correct. I hesitated to do that.
Q. Because you knew it wasn't true.
A. Even though I said I was willing to testify on direct, they did not bring me in there to testify.
Q. What?
A. They did not bring me in there to testify.
Q. Because at some level, do you think Robert knew that there was a big risk of you getting on the stand and telling the truth about the fact that --
A. Absolutely. I think Robert knew. I felt the prosecutor knew. I feel that they saw me as a risk.
Q. Of telling the truth?
A. That's right, telling the truth.
Q. And you believe that because you had told Robert that numerous times, that the substance of what was in that plea agreement was not true; and you had told them the truth --
A. That's right. And I told Diane Knott that I met

with traders and we had gotten into contracts. That's not something they wanted to have --

Q. They wanted to have what?

A. They didn't want me going to court, I feel.

Q. And say that?

A. And say that I honestly felt that we talked with legitimate traders and got into contracts and --

Q. So would it be accurate to say that you had told Diane Knott -- is she the IRS agent?

A. She's the IRS agent, yes.

Q. And would it be accurate to say that you had previously told Diane Knott -- is it Knox?

A. Knott, K-n-o-t-t.

Q. Diane Knott -- that the information that was in that plea agreement that you signed, you had previously told her that that information was not true. You had told her differently about the fact that the information that was in that plea agreement -- you had told her prior to you signing the plea agreement that the same type of information -- the same information was totally different than what you had told Diane before.

A. Well, put it this way: When she brought me the statement to sign they were going to present to Marian at her trial, I made some modifications to that statement because I did not feel they were accurate. And those

statements involved some of the falsehoods that were in there --

Q. In the plea agreement?

A. Well, those were in the statement, in the statement that I was signing.

Q. Right. And had you previously told Diane Knott that they were not true?

A. I hadn't told her they were not true. I wanted to make modifications.

Q. Well, did you tell her they weren't accurate, they weren't correct?

A. That's right.

Q. All right. So would it be accurate to say that you had previously told Diane Knott that some of the statements in your plea agreement that you did sign were not true statements? Did you previously tell that to Diane Knott?

A. You know what, Barry? I don't think I referred to my plea agreement to Diane Knott specifically.

Q. I'm talking about the information in there, that you had told her previously that the information in the plea agreement, that that information was not accurate, was not true. You previously told Diane Knott before you signed the plea agreement?

A. No. Actually, Barry, I hadn't. I hadn't told

her that.
Q. All right. Had you told anybody that besides Robert? I mean, the agents interviewed you, right?
A. Correct.
Q. Who interviewed you? Diane Knott and who else?
A. Diane Knott and Barbara Caruso.
Q. Who is she?
A. She's the FBI agent.
Q. All right. Any other law enforcement interview you?
A. Let's see. Yeah. Two other individuals. I think there was another IRS agent. I don't recall their names.
Q. And how many times did they interview you?
A. And Robert Monk.
Q. Robert Monk?
A. Yes.
Q. How many times did they interview you?
A. Robert Monk just interviewed me on my initial meeting, and after that Barbara Caruso was there each time.
Q. Along with who else?
A. Diane Knott was there each time with the exception -- when we signed the statement, it was only Diane Knott, not Barbara.
Q. Now, did you tell the law enforcement officers

who interviewed you the truth about the fact that you and Marian didn't do anything unlawful, or did you tell them that --

A. That's a pretty broad statement.

Q. All right. Did you tell them the same thing you told me when I first met you and that you were telling Robert when you were going over this information with him? Did you tell them that you and Marian were not engaged in unlawful conduct or fraudulent conduct, that you were engaged in perfectly lawful activity in your business transactions; or did you tell them things that were not true because you had been advised by your lawyer that if you didn't tell them the things they wanted to hear, that you couldn't get a deal?

A. You know, I didn't tell them that the things I was saying were untrue. You know, I was --

Q. All right. Tell me what you told them. Did you tell them that you were engaged in unlawful activity?

A. I did.

Q. And why did you tell them that if it weren't true?

A. You know, Barry, when I'm accepting a plea agreement and agreeing to plead guilty, then the statements I'm making are professing that I'm guilty.

Q. So you had to make these statements to get the

plea of guilty to get you as less time as you could. As I understand what you're saying, you basically had to go along with telling them these lies on you and Marian so that you could get a minimum amount of time.

A. So that I could sign a plea to reduce charges.

Q. Reduce charges and to get substantial assistance?

A. That's correct.

Q. Okay. Now, did you ever tell any of them the truth -- except your lawyer Robert, did you ever tell any of them that you really never had any criminal intent, that Marian never had any criminal intent, that you had a lawful business; or did you have to believe that if you told them the truth that you couldn't get your substantial assistance and get your charges reduced?

A. Well, like I said, if I'm agreeing to plead guilty, then the statements I'm making are outlining that I'm, in fact, guilty.

Q. Right. And implicating or inculpating Marian was just part of what you felt like you had to do to accomplish what you needed to accomplish for your own well-being.

A. True. True.

Q. And the only one that knew the truth of that was Robert because you had told him the truth.

A. That's right. Robert knew my real opinion.

Q. And he also knew that you were being pressured to

say what you were now saying contrary to what you had told him eight to ten times so you could get the sentence reduced, get substantial assistance, and get the charges eliminated.

A. That's true.

Q. And had you told him that?

A. Robert didn't like discussing it with me.

Q. I understand that, but he did discuss it with you?

A. Oh, yes.

Q. And you had told him that?

A. Oh, yes.

Q. And he knew that you were going to lie against Marian and that you did lie against her in the plea agreement and that if you had to, you were going to lie against her on the stand, right? He knew that. He knew that was coerced, that was not voluntary, wasn't true.

A. I'm sure he knew that. Without stating it, I'm sure he knew that was my opinion.

Q. Well, that wasn't an opinion; that was a fact that you had told him, right?

A. Yeah, that's right.

Q. It wasn't opinion. You had told him that fact over and over. So he knew that you were being pressured into saying things that were not true about your wife to get

your plea deal.

A. That's right.

Q. So when he got up on the stand and said that you were acting voluntarily and without duress, he was lying.

A. He was lying. He knew that wasn't completely true.

Q. Not that it wasn't completely true; it wasn't true at all because he knew the truth, right?

A. He knew the truth.

Q. You told him.

A. That's right. He did.

Q. So he's committed perjury if he was under oath, right?

A. He probably did.

Q. Not probably.

A. Well, I'm not a lawyer.

Q. Well, if somebody -- you don't have to be a lawyer to know if somebody takes an oath to tell the truth and they lie under oath. That's perjury.

A. That's perjury.

Q. And he lied under oath, right?

A. I think what he was testifying to was that my plea was willing.

Q. I understand. Was willing and voluntary and without duress.

**Sworn Statement**

A. Correct.
Q. But he knew otherwise --
A. He knew otherwise.
Q. -- because you told him.
A. That's right.
Q. So if he swore that you weren't under duress, he was lying.
A. He was lying.
Q. And that's perjury.
A. That's perjury. That's true.
Q. You just kind of hate to say it, don't you?
A. I do hate to say it.
Q. But it's true.
A. It's true.
Q. Okay. Well, you know, lawyers shouldn't get up on the stand under oath and lie. Matter of fact, nobody should.
A. Nobody should. That's right.
Q. But self-preservation -- do you know what I mean by "self preservation"?
A. Uh-huh. (Indicates affirmatively).
Q. What's that? Look out for your own ass first?
A. That's right. Cover your own ass.
Q. Is that what you were doing?
A. Correct.

Q. Even at Marian's expense?

A. Even at Marian's expense. I knew that.

Q. Well, you know what? At least you're man enough to admit it now under oath, and I guess it's been bothering you. It's been bothering you that you had done that and were going to agree to testify against her even though you knew it wasn't true.

A. That's right.

Q. It's been bothering you?

A. That's right.

Q. Is that why you've agreed to give me this statement here today?

A. That's why I've agreed to give you this statement today.

Q. And did the judge say something to you that intimidated you when you had to tell the judge a lie about yourself and Marian?

A. Did she say something that intimidated me?

Q. Well, to make you feel that if you didn't tell her what you believed the authorities wanted to hear -- well, you tell me. I want you to tell me. I understand you told the judge that you were guilty of wrongdoing, that you had committed fraudulent conduct.

A. Yeah. The judge looked straight at me and asked me directly am I accepting this plea because I am, in fact,

**Sworn Statement**

guilty.
Q. And you told her yes?
A. I agreed to that statement. I said yes.
Q. And you knew that if you told her otherwise that they would set aside your plea.
A. That's what I knew.
Q. And you wouldn't be able to get the deal that you were promised.
A. That's right.
Q. And so to ensure that you got the deal that you were promised, you continued on with the lie even to the judge.
A. I did.
Q. And you lied to the judge about Marian.
A. I did. Well, my plea involves -- the plea involves my own guilt.
Q. But you were lying about your own guilt and about Marian's guilt.
A. In essence. Because we're together --
Q. Because you wanted to get the sentence that you'd been promised.
A. That's right.
Q. And if you told the judge the truth, you couldn't have gotten that.
A. That's correct.

Q. That's what your lawyer told you.

A. That's right.

Q. So you went ahead with the lie to inculpate yourself and Marian for you to get your deal.

A. I did.

Q. And the lawyer knew that when he testified in federal court, that you were not -- that you were not under duress or being coerced. He knew that, didn't he?

A. Yeah, he did know that.

Q. Because you told him.

A. Yeah. He knew that, because he knew I felt I was under duress.

Q. And that's why the government didn't put you on because they knew there was a chance -- they knew down deep that you had told them that you hadn't done anything wrong and told the lawyer that, right?

A. Exactly.

Q. Had you told that to the government before as well?

A. What's your question again?

Q. Had you told the government that really, you didn't ever do anything wrong but you couldn't really stay with that position because you knew they wouldn't give you the deal?

A. Well, my version of what our crime was was

different than their version.

Q. Yeah. And they wrote the plea agreement.

A. That's right.

Q. And you told the government prior to that plea agreement being written and signed by you that the information in that plea agreement was different than what you had told them. They had said things in that plea agreement which you knew to be false.

A. Well, you're asking did I know that, or did I tell them?

Q. Well, both. You knew that, I know. You've already told me that, right?

A. Right. I didn't tell them what was in the plea agreement was false. I was discussing the statement that I signed with Diane Knott, that I made some modifications to that statement.

Q. All right. But my question would be: Did she put things in that plea agreement that you had told them earlier were not true and ask you to sign it in order for you to get your plea deal, which you signed?

A. You know, Barry, I don't think I had told them that they were not true.

Q. You don't think what?

A. No. I did not tell them that they were not true.

Q. You didn't? You always told them that they --

A. Yeah. I have to tow the line, you know. I have to plead guilty and say that I'm guilty.

Q. In order to get your plea deal.

A. Right.

Q. So that's what you did.

A. That's what I did.

Q. Okay. But your lawyer knew differently, because you had told him --

A. He knew differently, yes.

Q. And he knew that you were signing that under duress and coercion, right?

A. Yes, he knew that.

Q. And you think at some level he knew that if you testified in rebuttal that you may just tell the truth, and the government's case would go down the toilet, right?

A. He definitely knew that.

Q. That you may tell the truth?

A. That's right, that I would tell the truth.

Q. And that even if your plea deal exploded -- because when push came to shove like that, you may tell the truth and not lie under oath looking at Marian in front of you as a defendant, right?

A. That's right. He knew there was a risk to the prosecution's case in having me testify.

Q. That you would tell the truth.

A. That's right.
Q. So he convinced you that you should sign a waiver and let him testify for you.
A. That's right.
Q. Is that what he did?
A. You know, Barry, sitting here in jail and having these options presented to me, you know, after being here a year and a half and signing a plea and the requirements of cooperation and the implied need to get substantial assistance, how can anything that I would say not be under duress at that point? Because I want those benefits. I want the reduced charges. I want a 5K1 letter.
Q. From the government?
A. That's right.
Q. So you say what they want you to say --
A. That's correct.
Q. -- in order to get it --
A. That's correct.
Q. -- even though it's not true.
A. That's right.
Q. Well, that's a big problem in the system, John. Something has got to be done about that. Because there are a lot of innocent people in jail because people do what you were going to do and what you did in this case. The difference is, most of them get up and testify to the lies.

And the government and your lawyer knew at some level that if they put you on the stand in front of your wife, that you were going to tell the truth.

A. They knew I was going to tell the truth. Barry, all our clients in our MEH business, they were shocked that I would sign a plea because they know our hearts. They know we worked hard for them, that our intentions were honest, that we did not intend to commit a fraud on them.

Q. All right. Well, John, thank you so much for taking the time to talk to me. I know it was hard for you to do. I know it was not easy. I know that you know there's some risk involved in this to you. I know that you know that there will be some repercussions as a result of this, because I'm going to use it to Marian's benefit. And I hope that if any problems try to come to you for telling the truth, that you'll be treated the way you should be treated and not the way you've been treated by that lawyer who knew that you were lying and got up on the stand and committed perjury himself.

A. That's right.

Q. That's pathetic. He should be ashamed of himself and disbarred.

Anyway, thank you, John.

A. Thank you, Barry.

(Discussion off the record.)

BY MR. COHEN:

Q. Just a couple more things.

Before I came in here today to speak to you, I had not spoken to you from the first time I met with you, Todd Foster, and Everett Rice and your wife present, right?

A. Uh-huh. (Indicates affirmatively).

Q. Is that right?

A. That's right.

Q. I've never spoken to you before we went on the record, right?

A. No. That's correct.

Q. I never promised you anything?

A. Never promised me anything.

Q. Threatened in any way?

A. No.

Q. The only thing that I said to you off the record is -- I was complimentary of your physical physique being a little bit better looking -- better and stronger than the last time I saw you.

A. Thank you. I appreciate --

Q. That's all we --

A. That's all we said.

Q. Didn't discuss anything about the merit of the case, right?

A. No.

**Sworn Statement**

Q. Anything about what I was going to ask you?
A. No. That's correct.
Q. Now, I've forgotten to ask you about -- wasn't there a joint defense agreement between you and Robert Tager and Marian Morgan and her lawyer Peter Sartes?
A. Yes, there was.
Q. Was that a written agreement?
A. I believe it was a written agreement. Yes, it was. We signed it.
Q. And that joint defense agreement included information that you-all talked about in joint meetings, correct?
A. Exactly.
Q. And Robert --
A. So that we could have joint meetings.
Q. And you had joint meetings during the pendency of waiting on trial, right?
A. Yes, we did.
Q. About how many did you have?
A. You know, we probably had six or eight meetings perhaps on the high end.
Q. During those meetings, didn't Marian talk in front of Robert Tager pursuant to that joint defense agreement?
A. Yes.

Q. Didn't she tell Robert Tager all the time that she had not done anything wrong and there was no unlawful or illegal activities in the business transactions that you and she conducted?

A. All the time, yes.

Q. She told Robert Tager?

A. Yes.

Q. And she told that to her lawyer Peter Sartes at the same meetings, right?

A. Yes, she did. He was there, too.

Q. And you also told your lawyer at those joint meetings over and over again that you and Marian did not do anything illegal --

A. That's right.

Q. -- and did not do anything deceitful to the investors.

A. That's right.

Q. Did not do anything fraudulently, right?

A. Right.

Q. And you told that to Peter Sartes. He was present during that --

A. Yes. He was there.

Q. So both of you told both of the lawyers the same thing.

A. Yes, we did.

Q. And you never admitted to those two lawyers in the presence of each other that you did anything illegal or wrongful, right?

A. We only had discussions regarding my plea agreement. At the time, we were trying to have Marian take a plea.

Q. I'm talking about before that.

A. Before that while preparing for trial, no.

Q. Well, when you had joint discussions about you taking a plea, you had -- Marian had told them constantly during those discussions that she and you didn't do anything illegal or wrongful, right?

A. That's right.

Q. And she -- and you told that to your lawyer Robert Tager and Peter Sartes --

A. That's right.

Q. -- that you didn't do anything illegal or wrong.

A. That's correct.

Q. And Marian told you that she's not taking any deal because she didn't do anything illegal or wrong.

A. Exactly.

Q. And you told her in front of Pete and Robert that you didn't do anything wrong either, but you may consider taking a deal because you want to calculate the risk.

A. I told Marian we should take the plea so that we

**Sworn Statement**

would have the same sentence --
Q. Even though --
A. -- so we could be together.
Q. Even though you were pleading guilty to something that you didn't do, right?
A. That's right.
Q. And you want her to do the same thing.
A. I want her to do the same thing.
Q. And she told you she wasn't going to do it because she wasn't guilty of any wrongdoing, right?
A. That's right.
Q. And you knew she wasn't guilty of any wrongdoing.
A. I knew that.
Q. And she told you she'd rather run the risk of going to trial than admit wrongdoing when it wasn't true.
A. That's correct.
Q. And you told her basically that you felt differently, that you wanted to calculate your risk, get a cap, get the best deal that you could, tell them what they wanted to hear even if it meant testifying against her, even though you didn't want to but that you would if you had to to get your deal.
A. That's correct. There's a lot of --
Q. You and Marian just disagreed about that.
A. We did disagree about that.

**Sworn Statement**

Q. But the one thing that you know is true is that your lawyer knew the truth the whole time, and he knew you were under duress and being coerced to sign that plea agreement and to testify against Marian, if you had to, to get the best deal that you --
A. Yeah, he knew that.
Q. And you told him that, is that right --
A. That's right.
Q. -- notwithstanding that he got on the stand and said that you weren't under duress or being coerced?
A. Yes, that's right.
Q. That's why you say it's perjury; is that right?
A. That's why I say that.
Q. All right. You never expected him to get up on the stand and testify, did you?
A. I was very surprised when he asked me to waive attorney/client privilege.
Q. And he asked you that because he told you that the government would not hold it against you if you didn't testify, right --
A. That's right.
Q. -- that the government would not hold it against you on substantial assistance?
A. That's right. Just because I made myself available.

**Sworn Statement**

Q. And if you agreed to waive it and let him testify, that wouldn't be so bad for you; at least you're not having to lie against your wife in court, right?

A. Well, you know what? He didn't tell me that. But basically when I'm asked to do something and I'm required to cooperate, in my mind I'm thinking, Well, if I don't cooperate, then there's a negative result in terms of my plea.

Q. You could suffer some setbacks, meaning they could charge you with the original charges, they could not give you substantial --

A. Well, I would likely receive the full sentence according to the guidelines under my plea.

Q. Which is a hell of a lot more than 15 years.

A. Well, no. 15 years is the cap of my plea.

Q. As opposed to the ten years that you got?

A. That's right.

Q. Five years is a long time to be sitting in one of these --

A. Five years is a long time when I'm in my 50s. I'm not a kid anymore.

Q. So you considered that in -- so you decided, Hell, I may as well waive it and let him testify. Rather him lie than me, right?

A. Well, that's right. And he told me -- he

**Sworn Statement**

said he's not going to say anything damaging because Peter is not going to ask him any damaging questions. He knew there would be a risk in doing that.

Q. He'd already talked to Peter?

A. No, not that he talked to Peter. But he knew that if he was testifying on my behalf that, well, Peter wasn't going to take the risk in asking something that might receive an answer from Robert that would damage --

Q. Well, didn't Peter ask him a question like, Your client pled guilty because he was guilty? Didn't he? Did you hear that, that Peter asked --

A. I heard about that.

Q. And he said that's why you pled guilty.

A. I heard that.

Q. If that's true, that was a lie, too, wasn't it?

A. That was a lie, too.

Q. And he knew it was a lie, right?

A. Uh-huh. (Indicates affirmatively).

Q. "Yes"? Is that a "yes"?

A. That's a "yes."

Q. Because you had told him many times.

A. That's right. I told him many times.

Q. All right, John. I've got to go. Good to see you.

(Concluded at 4:16 p.m.)

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

I, the undersigned authority, certify that JOHN MORGAN personally appeared before me and was duly sworn on January 6, 2012.

WITNESS my hand and official seal this 6th day of January, 2012.

______________________________

Pamela Kingsbury, RPR
Notary Public - State of Florida
My Commission Expires: 7/18/14
Commission No. DD 993687

REPORTER'S CERTIFICATE

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

I, Pamela Kingsbury, RPR, Notary Public, certify that I was authorized to and did stenographically report the sworn statement of JOHN MORGAN; that a review of the transcript was not requested; and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 10th day of January, 2012.

______________________________
Pamela Kingsbury, RPR

## 1

13 (1)
24:14
15 (3)
14:13;52:14,15

## 2

2009 (1)
20:2
24 (1)
19:25

## 4

4:16 (1)
53:25

## 5

50s (1)
52:20
5K1 (1)
44:12

## A

able (7)
3:12;4:15;9:9;26:20;28:15;30:3;40:7
Absolutely (1)
30:17
accept (1)
28:2
acceptable (1)
27:8
accepting (2)
34:22;39:25
accomplish (5)
21:3,7;23:25;35:19,20
according (2)
30:4;52:13
account (1)
17:24
accounts (2)
16:7;20:4
accurate (8)
9:24;11:20;31:8,11,25;32:10,13,22
achieve (3)
23:5,9;24:5
achieved (1)
7:1
Act (2)
7:25;13:14
acted (4)
6:17;13:16;14:23;15:4
acting (8)
8:8,8;12:1;15:23,24;16:9;19:19;37:4
activities (2)
11:12;48:3
activity (4)
15:14;18:5;34:10,18
actually (2)
21:15;32:25
additional (1)
14:14
admissions (1)
10:9
admit (2)
39:4;50:15
admitted (1)
49:1
advice (2)
20:17,20
advise (1)
20:14
advised (1)
34:12
affirmatively (4)
4:8;38:21;46:6;53:18
again (3)
23:14;41:20;48:12
against (16)
6:15;13:24;24:21;25:19,22;28:7;30:4;36:13,14,16;39:6;50:20;51:4,19,22;52:3
agent (5)
21:14;31:9,10;33:8,12
agents (1)
33:3
ago (1)
3:8
agree (3)
21:9;28:14;39:6
agreed (5)
5:9;39:11,13;40:3;52:1
agreeing (2)
34:23;35:15
agreement (39)
5:1;12:11;14:2;21:10,12,17;23:12,17;25:4,12,18;26:15;27:13,19;29:13;30:23;31:15,18,19;32:3,15,19,22,24;34:23;36:15;42:2,5,6,8,14,18;47:4,7,8,10,24;49:5;51:4
ahead (1)
41:3
allegation (1)
8:6
allegations (1)
21:18
allowing (1)
20:12
along (7)
8:22;9:20;12:5,7;13:15;33:21;35:2
although (1)
8:21
always (8)
6:12;7:7;8:5;15:4,11,11;18:6;42:25
amount (4)
12:25;13:9;20:6;35:4
anymore (1)
52:21
appeal (1)
5:7
appreciate (1)
46:20
approximately (1)
15:20
argue (4)
16:1,2;18:1;25:14
around (1)
21:22
articulate (1)
4:13
ashamed (1)
45:21
Asia (1)
21:23
aside (1)
40:5
ass (2)
38:22,23
assess (1)
5:21
assets (3)
17:18,24;18:3
assistance (13)
14:5,20,21;24:5,7;26:25;28:1,5;35:6,13;36:3;44:10;51:23
assisted (1)
26:10
assumption (2)
10:18,21
assurance (1)
17:21
attorney/client (3)
26:5;29:25;51:17
author (1)
21:10
authorities (3)
9:7;12:20;39:20
authority (1)
11:21
available (2)
18:14;51:25

## B

back (5)
7:8;13:8;15:9;17:14;27:4
bad (1)
52:2
bank (2)
20:4;22:7
banks (4)
6:24;17:14,16;22:4
Barbara (3)
33:6,20,24
bargain (5)
25:7;26:20;27:13;28:1,21
Barry (11)
15:2;24:13;25:8;29:10;32:18,25;34:22;42:21;44:6;45:4,24
Based (1)
9:18
basically (15)
5:25;9:20;11:9;12:10;14:11;16:4,8;21:11;23:25;24:17;26:5;28:8;35:2;50:17;52:5
begin (1)
14:3
beginning (1)
22:2
behalf (3)
26:6;29:7;53:6
behavior (1)
12:11
benefit (15)
10:16;13:3,5,6,11;14:14;24:18,19,25;25:6;26:20;27:13;28:1,21;45:14
benefits (3)
10:8,10;44:11
besides (1)
33:2
best (9)
12:8,14,17,19;13:14;15:4;23:6;50:19;51:5
better (4)
20:15,23;46:18,18
big (2)
30:15;44:21
bit (1)
46:18
blocks (1)
17:18
both (8)
3:11;4:4;6:16;8:8;15:24;42:11;48:23,23
bothering (3)
39:4,5,9
boundaries (1)
6:2
bring (3)
19:13;30:11,13
bringing (2)
6:14;13:8
broad (1)
34:4
brokers (2)
16:16;21:24
brought (2)
27:4;31:22
business (27)
6:14,16,18;7:10,15,24;8:2;9:11;10:2,5;11:3,12,17,24;14:24;15:14,25;16:2,18;19:6,8;21:6;27:23;34:10;35:12;45:5;48:3
businesses (1)
29:15

## C

calculate (3)
20:23;49:24;50:18
calculated (1)
13:12
calculation (1)
23:6
call (1)
25:22
came (8)
8:11,18,24;9:19;14:2;28:25;43:20;46:3
can (3)
10:25;11:1;44:10
cap (4)
12:23;20:24;50:19;52:15
Caruso (2)
33:6,20
case (17)
5:25;6:14,15;9:5,20;14:10;18:11,12,13;20:3,13;24:11;29:18;43:15,24;44:24;46:24
cases (1)
7:2
caused (1)
20:2
certain (3)
10:5,8;13:9
Certainly (1)
7:17
certainty (2)
11:8;20:24
chance (1)
41:14
change (1)
27:14
charge (2)
27:1;52:10
charges (13)
10:20;13:6,8,18;14:18;27:1,4;35:5,6,14;36:3;44:12;52:10
cheat (1)
7:6
checked (1)
17:23
civil (1)
20:3
clear-cut (1)
16:8
client (1)
53:10

**clients (5)** 15:5;17:18;18:24;19:9;45:5
**clients' (1)** 18:4
**clouds (1)** 6:10
**coerced (4)** 36:17;41:8;51:3,10
**coercion (1)** 43:11
**COHEN (2)** 3:6;46:1
**combined (1)** 3:22
**comfortable (2)** 6:3;10:15
**coming (1)** 5:12
**commit (2)** 27:24;45:8
**committed (5)** 4:6;14:23;37:12;39:23;45:19
**communications (1)** 16:5
**company (1)** 11:15
**completely (2)** 37:5,7
**compliance (4)** 17:13,15,22;19:25
**complimentary (1)** 46:17
**computer (1)** 16:14
**concerned (2)** 19:20,20
**Concluded (1)** 53:25
**conduct (3)** 34:9,9;39:23
**conducted (1)** 48:4
**conforming (1)** 9:11
**consider (1)** 49:23
**considered (3)** 14:5;19:14;52:22
**consistent (1)** 8:19
**constantly (1)** 49:10
**contacted (1)** 5:6
**contacts (1)** 17:12
**contents (1)** 23:17
**continued (2)** 19:16;40:11
**continuously (1)** 25:5
**contract (3)** 16:17;19:9;21:21
**contracts (11)** 6:24;7:1,2;11:13;15:8;16:15;19:14,14;20:5;31:1,7
**contrary (1)** 36:1
**contributes (1)** 24:9
**control (1)** 16:8
**conversation (1)** 7:19
**convicted (1)** 5:3
**conviction (2)** 9:12;24:9
**convinced (1)** 44:2
**cooperate (3)** 20:9;52:6,7
**cooperating (1)** 14:17
**cooperation (7)** 12:24;13:7,8;14:5;24:4;26:9;44:9
**counter (1)** 29:7
**couple (1)** 46:2
**course (2)** 5:3;22:17
**Court (14)** 12:24;26:1,6;27:4,5,6,7,11;28:2;29:4,5;31:4;41:7;52:3
**Cover (1)** 38:23
**crime (1)** 41:25
**crimes (2)** 4:6;14:23
**criminal (11)** 3:10;6:17;7:5;13:16;14:24;19:17;20:19;21:5;24:21;35:10,11

## D

**damage (1)** 53:8
**damaging (3)** 29:18;53:1,2
**day (1)** 19:25
**deal (15)** 29:23;34:14;37:1;40:7,10;41:4,24;42:20;43:3,19;49:20,24;50:19,22;51:5
**dealing (2)** 6:7;17:2
**deals (1)** 7:15
**deceitful (1)** 48:15
**deceive (1)** 7:6
**decide (3)** 25:17,20,22
**decided (3)** 8:25;25:24;52:22
**decision (2)** 13:12;20:12
**deep (1)** 41:14
**defendant (2)** 24:10;43:22
**defense (4)** 28:16;47:4,10,23
**definitely (1)** 43:16
**demonstrating (1)** 16:18
**Denmark (3)** 11:15;18:19;19:15
**deposed (1)** 3:3
**described (1)** 7:21
**detail (3)** 5:13;19:23;20:6
**details (1)** 7:22
**determined (1)** 20:22
**Diane (17)** 21:14,16;30:25;31:9,12,14,21;32:6,14,17,19,23;33:5,6,22,24;42:15
**difference (1)** 44:25
**different (4)** 29:16;31:20;42:1,6
**differently (4)** 31:17;43:7,9;50:18
**difficult (1)** 24:15
**DIRECT (9)** 3:5;14:4,7,8,10;25:18,23,25;30:11
**directly (1)** 39:25
**disagree (1)** 50:25
**disagreed (2)** 16:4;50:24
**disbarred (1)** 45:22
**discretion (1)** 11:16
**discuss (2)** 36:8;46:23
**discussed (6)** 7:14;17:15;18:15,16;22:24;26:23
**discussing (2)** 36:7;42:14
**discussion (3)** 3:13;15:3;45:25
**discussions (6)** 15:12;22:17;27:18;49:4,9,11
**diver (4)** 5:17,19,22;8:20
**document (4)** 11:14,21;16:12;22:22
**documenting (1)** 17:9
**documents (6)** 18:15;19:1,4,5,7,25
**done (7)** 6:13,17;29:8;39:5;41:15;44:22;48:2
**down (3)** 14:3;41:14;43:15
**duly (1)** 3:2
**duress (12)** 13:9;26:9;29:6;37:4,25;38:6;41:8,12;43:11;44:11;51:3,10
**during (9)** 14:22;15:14;19:17;22:17;27:18;47:16,22;48:21;49:11

## E

**earlier (2)** 20:7;42:19
**easily (1)** 22:8
**easy (1)** 45:11
**effect (3)** 5:15;11:22;12:21
**effort (3)** 8:13;9:6,19
**eight (4)** 3:8;15:21;36:2;47:20
**either (2)** 12:20;49:23
**eliminated (1)** 36:4
**else (3)** 22:1;33:5,21
**E-mail (2)** 16:5,12
**E-mails (1)** 16:15
**end (2)** 3:16;47:21
**endorsed (1)** 22:5
**enforcement (2)** 33:9,25
**engaged (6)** 10:4;15:14;21:6;34:8,10,18
**enough (4)** 14:21;28:5;29:18;39:3
**ensure (1)** 40:10
**enter (1)** 27:23
**entered (5)** 5:1;7:15;11:18,24;21:20
**enterprise (1)** 7:10
**escrow (1)** 16:6
**essence (1)** 40:19
**Essentially (2)** 22:2;24:8
**establish (1)** 20:4
**Europe (1)** 21:23
**European (2)** 11:15;18:24
**even (17)** 5:14;18:3;20:16,18;22:25;25:19;30:10;39:1,2,6;40:11;43:19;44:19;50:2,4,20,20
**Everett (5)** 3:18,19,23;4:5;46:5
**evidence (2)** 24:9,21
**Exactly (4)** 13:2;41:17;47:13;49:21
**EXAMINATION (3)** 3:5;25:18,23
**examined (1)** 3:3
**except (1)** 35:9
**exception (1)** 33:23
**Exchange (1)** 7:25
**excuse (1)** 24:18
**exist (3)** 16:20;22:5,9
**expectation (1)** 13:10
**expected (3)** 23:11,16;51:14
**expense (2)** 39:1,2
**experience (2)** 8:20;24:16
**expertise (1)** 6:25
**explain (2)**

9:15;16:12
**explained (2)**
7:19;16:24
**explicit (2)**
12:11;13:6
**exploded (1)**
43:19
**extent (3)**
19:11,12,24

## F

**facing (1)**
3:11
**fact (12)**
6:16;10:5;16:24;18:17;30:16;31:17;34:1;35:17;36:20,23;38:16;39:25
**factors (1)**
9:13
**false (3)**
25:19;42:8,14
**falsehoods (1)**
32:1
**family (1)**
5:6
**far (3)**
9:2;19:19,20
**FBI (1)**
33:8
**federal (4)**
3:10;22:5,6;41:7
**feel (9)**
6:3;10:1,15;18:13;29:14;30:18;31:4,25;39:19
**feeling (1)**
18:6
**felt (11)**
6:1,1;9:10;18:9;20:15;29:15;30:17;31:6;35:19;41:11;50:17
**field (1)**
6:25
**fight (1)**
18:11
**figured (2)**
8:18;12:8
**find (3)**
8:25;9:6,7
**first (8)**
3:2,8,19,21;7:19;34:6;38:22;46:4
**fitting (1)**
9:11
**five (4)**
15:7;21:22;52:18,20
**fixed (1)**
6:6
**flying (1)**
6:9
**follows (1)**
3:3
**forget (1)**
4:16
**forgotten (1)**
47:3
**form (3)**
7:20,23;8:2
**forth (1)**
30:5
**Foster (3)**
3:14,19;46:5
**four (1)**
15:7
**fraud (4)**
18:5;27:24;29:15;45:8
**frauds (1)**
22:9
**fraudulent (11)**
10:1,4;11:3,8;12:7,11,12;21:5;27:23;34:9;39:23
**fraudulently (1)**
48:18
**front (5)**
29:5;43:21;45:2;47:23;49:22
**full (5)**
14:13,15;15:5;26:9;52:12
**fully (1)**
17:1
**funds (11)**
11:13,16,19;16:6;17:5,7,7,15,20,22;18:4

## G

**gaining (1)**
9:12
**gauge (1)**
6:1
**gave (2)**
11:15,20
**George (2)**
4:24,25
**giving (1)**
9:2
**goal (1)**
7:7
**goes (1)**
8:22
**good (2)**
4:13;53:23
**Gosh (1)**
18:17
**government (37)**
5:1;6:14;9:1,21;10:3,8,9,11;12:4,19;14:17;20:9;21:4;23:11,15,19,23;24:3,19;25:1,22,24;26:21,24;28:6,23;29:16,20,24;41:13,18,21;42:4;44:13;45:1;51:19,22
**government's (1)**
43:15
**guess (1)**
39:4
**guidelines (1)**
52:13
**guilt (3)**
40:16,17,18
**guilty (21)**
18:7,7,10;20:8,11,18;34:23,24;35:1,16,17;39:22;40:1;43:2,2;50:4,10,12;53:10,10,13

## H

**half (2)**
15:22;44:8
**happened (2)**
5:13;29:2
**happily (1)**
24:13
**hard (3)**
15:6;45:7,10
**hate (2)**
38:11,12
**hear (6)**
10:17;12:5;34:13;39:20;50:20;53:11
**heard (2)**
53:12,14
**hearing (7)**
9:18,18;11:2,6;20:3;26:12,13
**hearts (1)**
45:6
**heated (2)**
15:3,11
**hell (2)**
52:14,23
**help (5)**
9:17;11:1;12:22,25;13:17
**herein (1)**
3:2
**hesitate (1)**
30:6
**hesitated (1)**
30:8
**high (3)**
17:6,17;47:21
**himself (2)**
45:19,21
**hiring (1)**
3:10
**hold (2)**
51:19,22
**Holdings (2)**
11:16;18:24
**honest (4)**
4:2;16:9;26:10;45:7
**Honestly (3)**
15:2;29:14;31:6
**Hong (1)**
20:2
**honor (1)**
24:14
**hope (1)**
45:15
**hours (1)**
19:25

## I

**illegal (9)**
8:7;18:5;20:19;48:3,13;49:2,12,17,20
**IMF (1)**
22:7
**implicating (1)**
35:18
**implied (3)**
13:2,5;44:9
**imply (1)**
14:19
**impression (3)**
18:10;20:8;26:8
**included (1)**
47:10
**inconsistent (1)**
9:8
**inculpate (2)**
24:20;41:3
**inculpated (2)**
23:1,2
**inculpating (1)**
35:18
**independent (1)**
20:12
**Indicates (4)**
4:8;38:21;46:6;53:18
**individual (1)**
27:23
**individually (1)**
3:21
**individuals (1)**
33:11
**infer (1)**
12:21
**inference (1)**
10:23
**influence (1)**
20:11
**inform (1)**
12:24
**information (21)**
7:20,23;8:4;22:8,10,11,12;25:4,12;26:15;31:14,16,17,19,20;32:20,21,22;34:7;42:6;47:11
**informed (1)**
14:3
**initial (1)**
33:19
**innocent (1)**
44:23
**insisted (2)**
27:20;28:23
**insistence (1)**
15:4
**instead (1)**
28:25
**instruments (1)**
6:10
**intend (1)**
45:8
**intent (20)**
6:17;7:3;8:2;10:1,4;11:3,8,19;12:6,7,12;13:16;14:24;15:5;19:17;20:19;21:5,6;35:10,11
**intention (1)**
7:14
**intentions (2)**
10:2;45:7
**interest (8)**
7:9;12:8,14,17,19;13:14;15:5,10
**interference (1)**
28:16
**interpretation (1)**
27:10
**interview (4)**
18:21;33:9,14,18
**interviewed (6)**
18:14,15;33:3,5,19;34:1
**intimidated (2)**
39:16,18
**into (16)**
7:1,15;11:18,24;15:3,8,11;17:3;19:23;20:1,5;21:21;27:23;31:1,7;36:25
**investigated (1)**
18:13
**investments (1)**
21:25
**investors (3)**
15:15;17:6;48:16
**involved (4)**
7:22;13:9;32:1;45:12
**involves (3)**
10:19;40:15,16
**IRS (4)**
21:14;31:9,10;33:12

## J

**jail (4)**
12:25;25:15;44:6,23
**January (1)**
3:17
**JOHN (7)**
3:1,7;15:20;44:21;45:9,23;53:23
**joint (8)**
47:4,10,11,15,16,23;

48:11;49:9
**judge (7)** 39:15,16,22,24;40:12,14,23
**July (1)** 20:2
**jury (1)** 29:5

## K

**keeping (1)** 16:6
**kid (1)** 52:21
**kind (5)** 7:15;9:2;10:9;12:24;38:11
**knew (68)** 8:1;13:20,21,25;17:9;22:2,10,11,12,12,14,21;23:2,21;25:3;26:19;27:15,20;30:6,9,14,17,18;35:22,24,25;36:13,16,16,18,19,24;37:5,8,9;38:2,3;39:2,7;40:4,6;41:6,8,11,11,14,14,23;42:8,11;43:7,9,10,12,13,16,23;45:1,4,18;50:12,13;51:2,2,6;53:2,5,17
**Knott (15)** 30:25;31:9,12,13,14;32:6,14,17,19,23;33:5,6,22,24;42:15
**K-n-o-t-t (1)** 31:13
**knowledge (1)** 6:3
**known (3)** 16:19,21;22:8
**Knox (1)** 31:12
**Kong (1)** 20:2

## L

**Lanka (1)** 20:4
**large (2)** 17:6,18
**last (1)** 46:19
**later (1)** 25:20
**law (2)** 33:9,25
**lawful (7)** 7:3;12:1;15:14,25;16:13;34:10;35:11
**lawfully (4)** 11:25;15:24,24;19:19
**lawyer (30)** 4:16,17,19;11:15;14:3;15:3;16:6;18:19;22:15;23:11,16;25:3;26:4;28:25;29:23;34:12;35:9;37:16,18;41:1,6,16;43:7;45:1,17;47:5;48:8,11;49:14;51:2
**lawyers (3)** 38:15;48:23;49:1
**least (3)** 8:25;39:3;52:2
**legal (2)** 9:4;16:9
**legitimate (9)** 6:13,16;8:9;16:18;17:2,7,22;21:24;31:7
**less (3)** 10:16,19;35:1
**letter (1)** 44:12
**level (3)** 30:14;43:13;45:1
**liabilities (1)** 9:5
**lie (14)** 36:13,14,15;37:19;38:16;39:16;40:11;41:3;43:21;52:3,24;53:15,16,17
**lied (2)** 37:21;40:14
**lies (2)** 35:3;44:25
**likely (2)** 14:12;52:12
**limited (2)** 19:11,12
**line (1)** 43:1
**little (1)** 46:18
**long (2)** 52:18,20
**Look (1)** 38:22
**looked (1)** 39:24
**looking (3)** 9:12;43:21;46:18
**lot (7)** 6:7;21:18,20;24:13;44:23;50:23;52:14
**love (1)** 29:10
**loving (1)** 24:15
**lowest (1)** 23:8
**lying (7)** 28:18;37:4,5;38:7,8;40:17;45:18

## M

**making (5)** 8:13;9:6;12:10;34:24;35:16
**man (1)** 39:3
**managing (1)** 9:4
**manner (2)** 16:9,10
**many (17)** 6:13;15:18,20;18:18,25;22:24;25:8,11,13;26:16,18;27:21;33:14,18;47:19;53:21,22
**Marian (49)** 3:9,13,21,22;4:4,6,6,19;5:2,13;6:11,16;7:11;8:8;11:4;13:24;15:13,24;19:19,20;21:19;22:12;23:2,13,16;24:11;28:7,15;29:4;31:23;34:2,8;35:3,11,18;36:14;39:17;40:14;41:4;43:21;47:5,22;48:12;49:5,10,19,25;50:24;51:4
**Marian's (5)** 26:14;39:1,2;40:18;45:14
**married (1)** 24:14
**matter (4)** 3:11;22:17,19;38:16
**may (10)** 14:5,20;27:1;28:2,4;43:14,17,20;49:23;52:23
**Maybe (4)** 4:3;5:14;12:23,23
**mean (4)** 8:21;27:6;33:3;38:19
**meaning (2)** 19:4;52:9
**meant (2)** 27:6;50:20
**medium-term (1)** 22:3
**meet (1)** 25:14
**meeting (4)** 3:20;4:1;21:23;33:20
**meetings (8)** 19:24;47:11,15,16,20,22;48:9,12
**MEH (1)** 45:5
**merit (2)** 6:15;46:23
**met (9)** 3:8,19,21;15:2,19;21:21;30:25;34:6;46:4
**middle (2)** 17:17,17
**might (2)** 29:18;53:7
**mind (1)** 52:6
**mindset (1)** 8:19
**minimize (3)** 9:2,20;11:7
**minimizing-the-risk (1)** 8:19
**minimum (4)** 9:22;12:25;23:6;35:4
**misleading (3)** 11:19;27:3,5
**misrepresenting (1)** 15:6
**miss (1)** 20:3
**model (1)** 9:11
**modifications (3)** 31:24;32:9;42:15
**money (2)** 7:9;15:10
**Monk (3)** 33:15,16,19
**months (1)** 3:8
**more (4)** 13:2,5;46:2;52:14
**MORGAN (9)** 3:1,9;11:15;13:24;18:24;23:2,13;24:11;47:5
**Morgan's (1)** 23:16
**most (1)** 44:25
**mouth (2)** 8:13;11:2
**much (2)** 5:13;45:9
**myself (4)** 3:7,13,23;51:24

## N

**names (1)** 33:13
**Naturally (1)** 10:18
**necessarily (1)** 10:13
**need (2)** 17:19;44:9
**needed (2)** 18:16;35:20
**negative (1)** 52:7
**neither (1)** 8:21
**nervous (1)** 6:9
**net (2)** 17:6,17
**nevertheless (1)** 25:6
**nobody (2)** 38:16,18
**none (3)** 17:5,7;18:23
**nontraditional (1)** 8:1
**notes (2)** 3:25;22:4
**notwithstanding (3)** 13:13;26:19;51:9
**numerous (2)** 30:3,22

## O

**oath (11)** 3:2;23:12;26:14;28:7;37:12,18,19,21;38:16;39:4;43:21
**objective (2)** 21:8;23:25
**obtain (1)** 11:19
**obtainable (1)** 22:8
**occasions (4)** 6:13;15:18;25:13;26:17
**off (3)** 3:7;45:25;46:16
**offered (1)** 25:7
**officers (1)** 33:25
**one (7)** 7:20;11:11,21;16:1;35:22;51:1;52:18
**only (11)** 7:8;13:6;14:12;18:19;21:7;24:4;28:3;33:23;35:22;46:16;49:4
**open (1)** 20:25
**openly (1)** 29:4
**opinion (4)** 35:24;36:19,20,23
**opportunity (2)** 9:2,9
**opposed (3)** 6:5;20:24;52:16
**option (1)** 20:15
**options (1)** 44:7
**order (12)** 7:21;9:22;11:6;12:3;21:3;23:25;24:25;27:13;

28:8;42:19;43:3;44:17
**organizations (1)** 22:7
**original (7)** 10:2;13:8,18;14:18; 27:1,4;52:10
**originally (2)** 14:1,25
**otherwise (3)** 38:2,3;40:4
**out (8)** 3:12;4:15;9:1,6,7; 12:23;17:23;38:22
**outlined (3)** 7:23;14:13;21:12
**outlining (2)** 29:15;35:16
**outside (1)** 6:2
**over (11)** 5:12;11:16;15:21; 16:11;19:1,3;34:7; 36:24,24;48:12,12
**own (6)** 24:12;35:20;38:22,23; 40:16,17

**P**

**paperwork (1)** 22:25
**part (3)** 5:9;7:10;35:19
**passed (2)** 17:15,22
**pathetic (1)** 45:21
**pay (1)** 7:7
**paying (1)** 15:9
**payment (1)** 20:5
**pendency (1)** 47:16
**people (14)** 6:21,23,24;7:8,13;8:7; 11:12,24;17:2,2,25; 21:23;44:23,23
**perceive (1)** 14:17
**perfectly (1)** 34:10
**perhaps (2)** 8:1;47:21
**period (1)** 15:21
**perjury (7)** 37:12,19,20;38:9,10; 45:19;51:12
**person (2)** 18:20;21:21
**Pete (2)** 4:19;49:22
**Peter (11)** 4:20;47:5;48:8,20; 49:15;53:1,4,5,6,9,11
**phone (2)** 7:20,21
**physical (1)** 46:17
**physique (1)** 46:17
**pilot (4)** 5:16,19,22;8:20
**plea (65)** 5:1;10:19;13:6,10; 14:2,13;19:2;20:15,25; 21:10,12,17;23:12,17; 24:5;25:4,12,17;26:9,10, 15;27:13,19;28:2;29:8, 13;30:5,23;31:15,18,19; 32:3,15,19,21,24;34:22; 35:1,5;36:14;37:1,23; 39:25;40:5,15,15;42:2,4, 6,7,13,18,20;43:3,19; 44:8;45:6;49:4,6,10,25; 51:3;52:8,13,15
**plead (7)** 18:7,10;20:8,11; 34:23;35:15;43:2
**pleading (1)** 50:4
**pled (2)** 53:10,13
**pm (1)** 53:25
**point (2)** 20:22;44:11
**position (3)** 12:10;13:17;41:23
**Precisely (1)** 29:22
**prefer (1)** 20:11
**preparing (1)** 49:8
**presence (1)** 49:2
**present (8)** 3:13,14;4:5;28:16; 29:17;31:23;46:5;48:21
**presented (3)** 21:11;29:4;44:7
**presenting (1)** 18:3
**preservation (1)** 38:20
**pressured (2)** 35:25;36:24
**pretty (1)** 34:4
**previously (7)** 31:12,15;32:6,14,16, 21,23
**principal (2)** 7:8;15:9
**prior (2)** 31:18;42:4
**privilege (3)** 26:5;29:25;51:17
**probably (5)** 4:1;15:21;37:14,15; 47:20
**problem (1)** 44:21
**problems (2)** 24:13;45:15
**process (2)** 14:22;23:7
**produce (1)** 20:1
**produced (1)** 22:25
**producing (1)** 15:8
**professing (1)** 34:24
**programs (3)** 22:3,4,9
**promised (15)** 10:8,10;11:9;12:4; 15:10;25:1,18;26:21; 28:9,13;40:8,11,21; 46:12,13
**promises (2)** 10:14;16:5
**properly (2)** 15:4;18:14
**prosecution (1)** 29:14
**prosecution's (1)** 43:24
**prosecutor (2)** 21:16;30:18
**prospective (1)** 18:21
**providers (1)** 18:23
**providing (1)** 24:8
**publicly (1)** 22:8
**purpose (7)** 5:12;7:5,6;8:7,7;12:1; 15:25
**pursuant (1)** 47:23
**pursue (1)** 6:24
**pursued (1)** 7:1
**pursuing (1)** 11:13
**push (1)** 43:20
**put (11)** 5:15;7:21;8:13;17:19; 21:9;29:9,20;31:22; 41:13;42:18;45:2
**putting (2)** 8:13;11:1

**R**

**rate (1)** 8:24
**rather (4)** 6:7;29:1;50:14;52:23
**read (1)** 4:1
**real (3)** 18:3,3;35:24
**really (13)** 4:6;9:12,13,15,23,23; 11:3;18:11;22:22;24:20; 35:10;41:21,22
**reason (1)** 20:3
**reasonable (1)** 10:23
**rebuttal (5)** 14:1,12;28:4,7;43:14
**recall (1)** 33:12
**receive (3)** 14:13;52:12;53:8
**receiving (1)** 20:5
**recollection (2)** 3:25;4:4
**record (3)** 45:25;46:10,16
**records (1)** 16:15
**reduce (2)** 35:5,6
**reduced (5)** 10:19;13:6;35:14; 36:3;44:12
**reduction (2)** 14:15;28:5
**referred (1)** 32:18
**regarding (4)** 9:25;11:12;21:18;49:4
**regulated (1)** 7:24
**reinstate (1)** 14:18
**reinstated (1)** 13:18
**reintroducing (1)** 3:7
**relationship (2)** 11:18;24:15
**release (1)** 26:5
**relevant (4)** 18:15;19:1,4,7
**relying (2)** 17:21,24
**remember (3)** 3:12,15;4:7
**repeatedly (2)** 19:22,23
**repercussions (1)** 45:13
**rephrase (1)** 9:16
**represent (4)** 3:10;16:17;18:12;24:4
**representation (1)** 4:16
**represented (3)** 10:1;18:5;26:1
**representing (5)** 5:7;9:13;17:6,18; 21:24
**request (2)** 7:20,23
**requesting (1)** 8:3
**required (4)** 9:7;13:7;28:3;52:6
**requirements (2)** 9:12;44:8
**Reserve (2)** 22:6,6
**result (4)** 6:4;14:11;45:13;52:7
**results (1)** 20:1
**return (1)** 15:9
**returns (2)** 7:8;15:10
**reviewed (1)** 3:25
**Rice (3)** 3:18,19;46:5
**right (114)** 3:16,24;4:10,12;5:8, 18,23;6:18;8:5,17,23; 9:4;11:4,5;12:9,17;13:1; 14:9,11;15:16;17:1; 19:18,21;21:1,8;22:14; 23:8;24:12;25:2;27:17, 22;28:19,22;29:1;30:1, 20,25;32:6,12,13;33:2,3, 9;34:5,17;35:18,24; 36:16,21,22;37:2,8,11, 13,21;38:5,18,23;39:8, 10;40:9,22;41:2,16;42:3, 12,13,17;43:4,11,15,18, 22,23;44:1,4,14,20;45:9, 20;46:5,7,8,10,24;47:17; 48:9,14,17,18,19;49:3, 12,13,16;50:5,6,10,11; 51:7,8,11,12,14,20,21, 24;52:3,17,24,25;53:17, 22,23
**risk (17)** 5:22;6:2;8:22;9:3,20, 22;11:7;20:23;30:15,18;

43:23;45:12;49:24;50:14,18;53:3,7
**risk-free (1)** 9:9
**risky (1)** 29:20
**Robert (28)** 4:17,18;14:3;19:23;22:15;29:7,12,12;30:14,17,21;33:3,15,16,19;34:7;35:9,23,24;36:7;47:4,14,23;48:1,6;49:15,22;53:8
**run (1)** 50:14

## S

**same (11)** 5:24;14:25;15:1;31:19,20;34:5;48:9,23;50:1,7,8
**Sartes (6)** 4:20,21;47:5;48:8,20;49:15
**sat (1)** 14:3
**saw (3)** 16:15;30:18;46:19
**saying (13)** 10:3;11:23;12:5,6;15:17;16:4,13;24:19;27:12;34:16;35:2;36:1,25
**scuba (4)** 5:16,19,22;8:20
**Securities (1)** 7:24
**self (1)** 38:20
**self-preservation (1)** 38:19
**sent (1)** 11:14
**sentence (7)** 14:15;23:9;28:5;36:2;40:20;50:1;52:12
**sentenced (2)** 5:2,4
**sentencing (4)** 11:8;12:23,23;13:17
**set (1)** 40:5
**setbacks (1)** 52:9
**several (1)** 7:2
**shared (1)** 6:12
**shocked (1)** 45:5
**shove (1)** 43:20
**show (1)** 16:12
**side (1)** 9:13
**sign (11)** 10:19;25:6,25;29:24;31:23;32:15;35:5;42:19;44:2;45:6;51:3
**signatory (1)** 17:24
**signed (19)** 7:20;11:14,21;22:16,21;23:1,12,18;25:17;26:15;29:3,6;31:15;32:23;33:23;42:5,15,20;47:9
**significant (1)** 20:6
**signing (6)** 8:2;22:22;31:18;32:5;43:10;44:8
**sister (1)** 5:7
**sitting (2)** 44:6;52:18
**six (1)** 47:20
**skill (1)** 6:3
**solicited (1)** 8:3
**somebody (4)** 4:17;7:6;37:17,18
**sometime (1)** 25:20
**somewhat (1)** 9:9
**Sorry (1)** 13:4
**speak (1)** 46:3
**speaking (1)** 24:1
**specific (3)** 10:10,14;16:11
**specifically (1)** 32:19
**spoke (3)** 14:25;18:24,25
**spoken (4)** 5:14;18:20;46:4,9
**Sri (1)** 20:4
**stand (8)** 30:15;36:16;37:3;38:16;45:2,18;51:9,15
**start (2)** 3:7;25:11
**stated (2)** 18:2;29:4
**statement (19)** 11:20;23:24;25:9,10;26:1;29:3,5,8;31:23,24;32:4,5;33:23;34:4;39:12,13;40:3;42:14,16
**statements (23)** 9:25;10:4,7,21,25;11:11,20;17:21;21:11,18,20;22:5,16;23:20;26:11;27:3,5;32:1,15,16;34:23,25;35:16
**States (1)** 19:15
**stating (2)** 21:20;36:18
**stay (1)** 41:22
**steal (1)** 7:6
**still (3)** 6:22,23;20:20
**story (1)** 9:14
**straight (1)** 39:24
**strong (1)** 29:18
**stronger (1)** 46:18
**stuff (1)** 29:12
**subject (2)** 22:17,18
**submitted (1)** 17:11
**substance (1)** 30:22
**substantial (13)** 14:5,20;24:5,6;26:25;28:1,4;35:6,13;36:3;44:9;51:23;52:11
**substantially (1)** 10:16
**suffer (1)** 52:9
**sufficient (1)** 13:9
**suggest (1)** 14:16
**suggested (2)** 12:4,20
**suggesting (1)** 13:15
**sure (7)** 3:14;4:14;8:14;13:22;27:14;36:18,19
**surprised (1)** 51:16
**swore (1)** 38:6
**sworn (1)** 3:2
**system (1)** 44:21

## T

**Tager (12)** 4:18,19;14:3,22;22:15;26:16;27:15;47:4,23;48:1,6;49:15
**talk (2)** 45:10;47:22
**talked (5)** 18:18;31:6;47:11;53:4,5
**talking (4)** 3:9;11:11;32:20;49:7
**tell (42)** 10:25;14:22;15:1,13,18;17:25;19:16;23:23;28:17;29:14;32:10,16;33:25;34:2,5,8,11,13,15,17,18,20;35:8,9;37:18;39:16,19,21,21;42:10,13,24;43:14,17,18,20,25;45:3,4;48:1;50:19;52:4
**telling (8)** 16:8;27:6;30:16,19,20;34:6;35:3;45:15
**tells (1)** 6:11
**ten (5)** 3:8;5:2;15:21;36:2;52:16
**term (1)** 14:19
**terms (8)** 9:4;14:1,14;19:9;21:12;24:4;30:4;52:7
**test (1)** 8:25
**testified (5)** 14:6;26:13;30:2;41:6;43:14
**testify (31)** 13:24,25;23:11,16,19,24;25:18,21,25;26:6,8,14;28:4,7;29:1,1,7,25;30:4,10,11,13;39:6;43:24;44:3,25;51:4,15,20;52:2,23
**testifying (7)** 14:4,12;23:14;29:19;37:22;50:20;53:6
**testimony (5)** 24:8;25:19;26:1,3;27:14
**thinking (1)** 52:6
**though (9)** 20:16,18;25:19;30:10;39:6;44:19;50:2,4,21
**thought (3)** 6:18;16:21;18:17
**threat (1)** 13:7
**Threatened (1)** 46:14
**three (1)** 3:20
**times (15)** 9:10;15:20,21;22:24;25:8,11;26:18;27:21;30:3,22;33:14,18;36:2;53:21,22
**today (4)** 5:12;39:12,14;46:3
**Todd (6)** 3:14,17,19,23;4:5;46:5
**together (3)** 17:20;40:19;50:3
**toilet (1)** 43:15
**told (113)** 4:4,5,6,7;5:13,15,16,21;6:6,12,21,23;8:5,7;10:16;11:13,14;14:25;15:7,23;17:1,8,9,11,12;19:22;20:1,13,18;21:1;22:15,18,23;24:23,24;25:5,8,11,13;26:16,18;27:7,16,17,19,21,22,25;28:3,6;29:12;30:21,23,25;31:8,12,15,16,18,21;32:6,8,14,21,23,25;33:2;34:6,17;35:12,23;36:1,6,11,21,23;37:10;38:4;39:22;40:2,4,23;41:1,10,15,16,18,21;42:4,7,12,18,21,25;43:8;48:6,8,11,20,23;49:10,14,19,22,25;50:9,14,17;51:7,18;52:25;53:21,22
**totally (1)** 31:20
**tow (1)** 43:1
**toward (1)** 24:9
**trade (10)** 6:24;11:13;15:8;17:3;18:23;20:1,5;21:21;22:3,9
**trader (1)** 21:22
**traders (8)** 6:24;16:16;17:16,19,21;21:24;31:1,7
**trades (4)** 16:19;17:12;18:2;22:25
**trading (1)** 22:3
**Tragos (2)** 4:24,25
**transaction (1)** 17:20

**transactions (9)**
10:5;11:24;14:24;15:14,25;19:17;21:6;34:11;48:3
**transferred (2)**
16:7;17:20
**travel (1)**
19:24
**treated (3)**
45:16,17,17
**trial (17)**
5:3,6;14:2;18:11;20:13,25;21:2;23:13,16;24:21;26:14;29:2,17;31:24;47:17;49:8;50:15
**true (58)**
5:17;12:16;13:13;15:11;21:4,19;22:1,13,14,16,22;23:3,18,20,21;24:20;25:4,5,9,10,12;26:12,16,17,18;27:15,21;29:6,13;30:7,9,23;31:16;32:7,8,16,23;34:11,21;35:21,21;36:5,17,25;37:6,7,8;38:10,13,14;39:7;42:19,22,24;44:19;50:15;51:1;53:15
**truth (30)**
9:8;17:25;22:18;25:13;27:6,7,20;28:17;30:16,19,20,24;34:1;35:9,13,22,23;37:8,9,18;40:23;43:14,17,18,21,25;45:3,4,16;51:2
**try (2)**
19:13;45:15
**trying (6)**
9:16;18:6,9;20:8,10;49:5
**two (3)**
11:10;33:11;49:1
**type (2)**
16:17;31:19
**types (2)**
22:3,7

**U**

**uh-huhs (1)**
4:11
**uh-uhs (1)**
4:11
**uncertainty (2)**
6:5;20:24
**uncomfortable (1)**
21:1
**under (25)**
14:1,19,20;16:7;23:12;24:4;26:9,9,14;28:7;29:6;37:12,19,21;38:6,16;39:4;41:7,12;43:10,21;44:10;51:3,10;52:13
**United (1)**
19:15
**unlawful (7)**
8:7;16:10,22;34:2,9,18;48:2
**unlawfully (2)**
13:14,16
**unless (2)**
14:4,6
**unlimited (1)**
11:16
**untrue (1)**
34:16
**up (6)**
19:13;37:3;38:15;44:25;45:18;51:14
**use (4)**
11:12,16;18:4;45:14

**V**

**valid (1)**
19:14
**variables (3)**
6:7,9;21:2
**version (5)**
29:15,16,17;41:25;42:1
**voluntarily (1)**
37:4
**voluntary (2)**
36:17;37:24

**W**

**waiting (1)**
47:17
**waive (3)**
51:16;52:1,23
**waiver (2)**
29:24;44:2
**waters (1)**
8:25
**way (10)**
5:15;8:9,15;16:17;21:7,9;31:22;45:16,17;46:14
**well-being (1)**
35:20
**weren't (10)**
3:11;4:3;18:2,3,7;32:10,11;34:20;38:6;51:10
**What's (2)**
38:22;41:20
**whole (1)**
51:2
**wife (14)**
13:24;23:2;24:11,12,14,18,20;25:20;29:10;30:4;36:25;45:2;46:5;52:3
**willing (7)**
18:11;20:13;23:24;28:20;30:10;37:23,24
**wiring (1)**
17:15
**without (11)**
6:10,17;7:5;9:12;11:1;17:9;28:16,17;36:18;37:4,25
**witness (6)**
3:2,4;14:1,4;28:4,7
**witnesses (4)**
18:14,18,21,22
**word (3)**
4:13;15:11;17:14
**words (3)**
8:13;11:1;12:21
**work (3)**
3:12;4:15;15:7
**worked (3)**
15:6;19:25;45:7
**world (2)**
21:23;22:6
**worth (2)**
17:6,18
**write (1)**
21:13
**written (4)**
5:14;42:5;47:7,8
**wrong (8)**
8:12,16;41:15,22;48:2;49:17,20,23
**wrongdoing (4)**
39:22;50:10,12,15
**wrongful (3)**
12:6;49:3,12
**wrote (3)**
21:14,15;42:2

**Y**

**year (2)**
15:22;44:8
**years (10)**
5:2;14:13;15:7;21:22;24:14;52:14,15,16,18,20
**you-all (4)**
3:10;6:13,18;47:11